## COLE *v.* STATE.

(Division B.   February 11, 1935.)

[159 So. 296.   No. 31581.]

**J. B. & A. K. Edwards**, of Mendenhall, for appellant.

**W. D. Conn, Jr.**, Assistant Attorney-General, for the state.

Argued orally by **A. M. Edwards**, for appellant.

**Anderson, J.,** delivered the opinion of the court.

Appellant was indicted jointly with his father, Leonard Cole, of the crime of manslaughter in the slaying of one Will Wiggington  There was a severance, and appellant was tried alone, convicted, and sentenced to the penitentiary for a term of seven years.  From that judgment he prosecutes this appeal.

The only eyewitness to the slaying, besides appellant, his father, and the deceased, was Oscar Easterling, a nine-year-old boy, upon whose evidence alone the state's case stands.

Wiggington, the deceased, had leased and resided on a farm belonging to the Federal Land Bank, which appellant's father at one time had owned.  The farm was located on the Mendenhall and Prentiss public road.  Wiggington's residence was near the road, and along by the road and part of the farm was a peach orchard.  Appellant's father testified that Wiggington had given him permission to get peaches from the orchard.  On the day of the homicide appellant and his father were riding in an automobile and stopped their car in the road near the orchard.  Appellant's father got out of the car, went into the orchard, got some peaches, and came back into the road.  Wiggington thereupon came out into the road armed with a single-barreled shotgun. A fight ensued in which appellant's father's left arm was broken, and Wiggington was killed by blows over the head with his own shotgun.  The facts thus far stated are without dispute.

The nine-year-old boy, Oscar Easterling, testified that Wiggington came out with his shotgun, an altercation and fight ensued between appellant's father and Wiggington, and that while they were fighting appellant stood by holding a pistol on Wiggington; that appellant walked up to Wiggington with his pistol, took Wigging-

ton's shotgun from him, and hit him three times over the head with the gun; that he struck one lick with the gun and missed Wiggington and hit his father's left arm; and that after the fight was over Wiggington got up and went back into his house. Wiggington lived for some days. The evidence of the physicians who testified showed that although there was no fracture of the skull, his death, which occurred several days thereafter, was caused by the blows on the head.

Appellant and his father testified that appellant had no pistol, and took no part in the fight which was entirely between appellant's father and Wiggington; that Wiggington came out of his house with a shotgun, drew it on appellant and his father, at the same time telling them to hold up their hands; that appellant's father and Wiggington approached each other, and when they got close enough the father tried to take Wiggington's gun from him; that in the struggle Wiggington struck appellant's father's left arm, breaking it with the gun; that Wiggington struck at him the second time, missing him and striking a timber on a bridge nearby, which blow bent the barrel of the gun. The gun was introduced in evidence showing the bent barrel. They further testified that finally appellant's father got the gun away from Wiggington and struck him over the head with it twice knocking him to the ground; that appellant's father struck Wiggington over the head with the gun because he made a demonstration as if to pull a weapon out of his pocket; that Wiggington then got up, and as he was arising made a statement which will hereafter be referred to in another connection; that Wiggington thereupon left the scene and went to his house, and appellant and his father went on their way.

Appellant offered to prove by his father that as the fight was ending, or a moment after it had ended, appellant's father said to Wiggington: "What did you

mean?" To which Wiggington replied: "If I had known it was you I wouldn't have hit you for anything in the world." This evidence was ruled out by the court. That action of the court is one of the errors assigned and argued on behalf of appellant. Appellant claimed that his father struck the fatal blows in self-defense. The question, therefore, as to who was the aggressor was material. The excluded evidence had a bearing on that question. If true, it was apparently a confession by Wiggington that he was the aggressor. It was competent as a part of the res gestae; if not made exactly during the fatal difficulty, it was made so soon thereafter as to be a part of it. It was error to exclude it.

The court gave the following instruction for the state, the giving of which appellant assigns and argues as error: "The court instructs the jury for the state that if you believe from the evidence in this case, beyond a reasonable doubt, that the dfendant, Eley Cole, and Leonard Cole, being armed with a deadly weapon, to-wit, a pistol, went onto and in and near the premises and peach orchard of deceased, Will Wiggington, and then and there engaged in a difficulty with him, and that Elzey Cole, with a deadly weapon, to-wit, a shotgun, did then and there wilfully, unlawfully and feloniously strike, kill and slay deceased, not in his necessary self defense, and at a time when he, Elzey Cole, nor Leonard Cole, were in no real or apparent danger of losing their own life or lives, or sustaining some great bodily harm at the hands of deceased, then it is your sworn duty to find the defendant guilty as charged in the indictment. And this is true regardless of every other fact and circumstance in this case."

We are of opinion that appellant's contention is well founded. The first part of the instruction told the jury that if they believed from the evidence, beyond a reasonable doubt, that appellant and his father being armed with a deadly weapon, to-wit, a pistol, went on or near

the premises of Wiggington and then and there engaged in a difficulty with Wiggington, etc. In the first place, there was no evidence whatever to show that appellant's father was armed with a pistol or any other weapon until he took Wiggington's shotgun away from him. In the next place, the last sentence of the instruction, which told the jury that if they believed the hypothetical case embodied in the instruction they should convict regardless of every other fact or circumstance in the case, was calculated to mislead the jury. We do not mean to hold that this language is technically wrong, but we do hold that to the lay mind it is confusing. The ordinary juror might reasonably infer that the court meant that he should pay no attention to anything in the case except the case embodied in the instruction.

Reversed and remanded.